Matter of Cheyanne B. V. (Larry A. V.) (2003 NY Slip Op 51502(U))

[*1]

Matter of Cheyanne B. V. (Larry A. V.)

2003 NY Slip Op 51502(U)

Decided on November 26, 2003

Family Court, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 26, 2003

Family Court, Monroe County
In the Matter of Cheyanne B. V. and Nikolas A. V. 
 Children under the Age of Eighteen Years Alleged to be Neglected by
LARRY A. V., RESPONDENT.
Index No.: NN 08983-03
APPEARANCES:

Peter Essley, Esq., Deputy County Attorney, of counsel
Frederick P. Lester, Esq., for Respondent
Stephen R. Weisbeck, Esq., Law Guardian

MARILYN L. O'CONNOR, J.

DECISION AND ORDER
Monroe County Department of Human and Health Services filed a petition under Article 10 of the Family Court Act on August 12, 2003 alleging that respondent father had neglected his children, Cheyanne, age 2 1/2 (DOB 1/24/01) and Nikolas, an infant (DOB 9/16/02). At the time of the filing, the father was incarcerated and the mother was deceased, and the Respondent/father was legally responsible for the children's care. Prior to the death of the mother and the incarceration of the father, the daughter Cheyanne had been in the father's custody, and the infant son Nikolas had been in the mother's custody. The petition alleges that the father neglected the children by taking actions which resulted in him being stopped at about 3:30 AM while driving a car with his daughter in the back seat, filthy and only partially dressed, and with the body of the children's mother in the trunk of his car, wrapped in a blanket bound with duct tape. It is also alleged that the respondent father acknowledged that the children's mother was dead. It was further alleged that the daughter knew her mother was dead, and when asked about her father, she began to shake and cry. The petition alleges that the daughter was immediately removed from the father's care, and reasonable efforts to prevent or eliminate the need for removal were not made because of the immediate incarceration of the respondent father and his pending murder in the second degree charges. A history of domestic violence between the parents was alleged. For the reasons set forth below, the petition is sustained based on the evidence adduced at trial and the court finds the children were neglected children.
At the hearing, Maria Bianchi, a Child Protective worker, Deputy David Kron, of the Monroe County Sheriff's Office; Lynn Oswald, emergency foster care parent; Dr. Caroline R. Dignan; forensic pathologist and Deputy Medical Examiner; and Investigator Thomas Passmore, [*2]of the Monroe County Sheriff's Office, were the witnesses for the petitioner. The respondent did not testify, nor did he call any witnesses. The petitioner's witnesses were credible.
Officer Kron testified to the following facts and observations. He said that he stopped the respondent due to the burned out taillights on his car at about 3:30 AM, observed the little girl asleep in the back seat, discovered in a computer check that the respondent had an outstanding harassment warrant, discovered that the car had no valid registration and no insurance, and placed the respondent in custody. He then called a friend suggested by respondent to come take the child, and that the friend came, arriving at 4:20 AM. However, upon doing the routine inventory search of the car, which he was having towed pursuant to standard procedures, he observed what was obviously a body wrapped in something like a blanket and duct tape in the trunk. Thus, he asked the respondent about the situation and was informed by him that there was a person in the blanket, who did not need an ambulance. The officer pressed on the body through the blanket and found it stiff. He also found a gallon of gasoline, a can of starter fluid, a rope and a bag of charcoal in the trunk. As a result Child Protective was called, and arrangements were made for Child Protective worker Bianchi to take the girl to an emergency foster care parent, Ms. Oswald.
Bianchi testified that she arrived at the scene where the respondent was stopped, and observed that the little girl was extremely filthy over her whole body, wore only jeans and a very dirty and smelly diaper, had very matted hair, and seemed frightened. She did not notice bruising on the child. The child had been in a car seat.
Ms. Oswald's testimony confirmed that the girl was delivered to her around 7:30 AM, wearing only jeans and a very dirty diaper, with "Nothing on top and no shoes". Additionally, "she was dirty and she had very muddy feet". The mud struck Ms. Oswald as unusual, being black not brown. Cheyanne was promptly given a bath as she "really needed one". Ms. Oswald had to wash the little girl's hair twice. Ms. Oswald further testified that the girl ate two bowls of cereal and some toast for breakfast. Significantly, she explained that while sitting on the woman's lap, the girl pointed to the floor and said, "Mommy, mommy no more, mommy dead". This was volunteered not solicited. Ms Oswald further testified that about an hour and a half after the girl arrived, and not knowing the details of what was going on, she asked the little girl about daddy. The little girl responded by "cowering into" or snuggling into her, and not saying anything, and she "started shaking". Ms. Oswald promptly changed the subject, took her to another room and turned on the television for her.
The medical examiner, Dr. Dignan, testified to her method of examining the body and that the children's mother had died from asphyxiation. She explained that she drew this conclusion from the many petechiaevery tiny hemorrhages caused by pressure building up and the vessels burstingin her eyes, on her face, in her mouth, on her chest and shoulders. Dr. Dignan noted that the victim was naked when removed from the wrapping material, which turned out to be a mattress pad. The body was positively identified as the children's mother by the dead woman's own mother. Dr. Dignan testified that the body had plastic wrap tightly wrapped around the head and neck several times; had a hemorrhage in the neck i.e., deep bruising in the neck which did not show up on the skin. The doctor said this was caused by force applied to the neck. She could not say whether the children's mother died of strangulation or smothering, both of which are methods of asphyxiation. The doctor, who testified that she had seen perhaps one [*3]hundred or even more cases of asphyxiation, concluded that the victim could have died one or two days before she was found in the car trunk, and that she was a homicide victim. Dr. Dignan tested for evidence of a sexual assault or sexual activity, both vaginally and rectally, and found no sperm. She concluded there was no evidence of sexual intercourse prior to death.
The final witness, Investigator Passmore, who interviewed the respondent father, testified to statements made by him. Passmore said the respondent said he believed that his kids were "better off" without him or the mother and at least now they would "have a chance". He testified that the respondent said he hated the mother for having Nikolas, and that he would never forgive her for that. He testified that the respondent admitted that they were always arguing, that he hated her but she kept coming over, and that they kept up a sexual relationship but he would go back to "treating her like s___". Specifically about her death, respondent twice said "he didn't mean to kill her". However, the respondent also said that "after it was over" he walked into the girl's bedroom where she was sleeping and "brushed the hair away from her face and basically told her 'you're welcome'". Respondent told Passmore he was scared when the victim's mother said she was going to call the police if she could not find her daughter. So he waited till after 2 AM, figuring there would be less cars and police on the road, and then when stopped, claimed to be out "looking for open space."
The court finds that the facts are in accordance with the testimony of the witnesses. The court ruled at trial that evidence of the respondent's admissions were admissible in this civil matter (Terpstra v Niagara Fire Ins. Co., 26 NY2d 70; cf. In re Diane P., 110 AD2d 354), and there was no common-law voluntariness issue raised (see In re Simpson, 26 Misc2d 162). The court further finds that an inference can be drawn against the respondent in this civil matter for not taking the stand to explain the incriminating situation (see Marine Midland Bank v John E. Russo Produce Co., 50 NY2d 31), and that the preponderance of the evidence establishes that the respondent killed the children's mother as admitted. The court specifically finds, as advocated by the law guardian, that the little girl's emotional condition was actually impaired by the father's actions and that her condition was in imminent danger of becoming physically impaired and further emotionally impaired as a result of whatever he did that she saw. The court finds that whatever she saw and however she came to be filthy, partially clothed, and out in the middle of the night, these circumstances affected her so badly that she volunteered her mommy was dead and shook and cowered at the question about her daddy. The court further finds that the baby boy's emotional condition was in imminent danger of becoming impaired because the father admittedly killed the mother, who had had custody of him, and he did not even want the boy to be born in the first place. Though the infant boy is simply too young to have this situation explained to him or to be put in therapy to soften its effect this lack of communication skills inherent in infancy cannot be found to justify relieving a parent of a neglect finding for homicidal behavior which was unquestionably harmful to the infant's emotional future. At the very least the boy must be found to be derivatively neglected due to the father's mistreatment of his sister.
The actions of the father, in admittedly killing the children's mother, though not set forth expressly as a way to neglect one's children, unquestionably must fit within the statutory standard of "other acts of a similarly serious nature requiring the aid of the court". (Family Court Act, § 1012[f][i]B].) When compared to itemized acts of neglect, i.e., drug and alcohol abuse, excessive corporal punishment, failure to supply adequate food, clothing, shelter, education or [*4]medical care, one parent killing his children's other parent is unspeakably more harmful. As stated in Matter of Vere C., (181 Misc 2d 406-407), where the respondent was the convicted murder of the children's mother,
When respondent murdered the children's mother, he deprived them of a parent, left them without a home and, thereby, indisputably impaired their emotional health. Accordingly, without the necessity of a hearing and notwithstanding that petitioner has failed to demonstrate that the murder occurred in the children's presence, this court finds that respondent neglected the children as a matter of law. (Family Ct Act § 1012 [f]; cf., State ex rel. Children, Youth & Families Dept. v Joe R., 123 NM 711, 945 P2d 76 [1997] [holding that conviction and incarceration of a parent for the murder of the other parent is prima facie evidence of neglect]; accord In re C.M.J., 278 Ill App 3d 885, 663 NE2d 498 [Ill App Ct 1996].)
 It is useful to compare Matter of Scott JJ (280 AD2d 4), where the Third Department held that the father's conviction for murder in the second degree for intentionally killing the children's mother while the children were in his care constituted a prima facie case that he neglected his children, citing Matter of Vere C., supra. While the case at bar could be distinguished because the father has not been convicted of murder, this difference is insignificant. The unrebutted testimony shows that respondent father admitted killing the children's mother and the other evidence corroborates the truth and reliability of that admission, which was proper evidence in this civil action. The court wrote in Matter of Scott JJ, supra, pp7-8,
. . . we need neither the testimony of witnesses nor the reports of experts to establish that one parent's intentional murder of the other constitutes prima facie evidence that the murdering parent has indeed neglected the children simply by committing that very heinous act. Respondent's conduct deprived his children of their mother by death and their father by incarceration; the emotional scars from these profound deprivations are manifest. Respondent's behavior was so outrageous that it obviously harmed the children and the lack of testimony of "actual injury" to them is not fatal to the Department's case under these compelling circumstances (see generally, Matter of Christina LL., 233 AD2d 705, 708-709, lv denied 89 NY2d 812).
As suggested by Matter of Scott, JJ., there must be at least a rebuttable presumption that an incarcerated parent by definition cannot provide for the emotional needs of his or her children. Thus, so long as the respondent remains incarcerated, and with no rebuttal, Cheyanne and Nikolas, must be found by definition to have their emotional condition in imminent danger of becoming impaired as a result of inability of this incarcerated father to exercise any degree of emotional care whatsoever with respect to the children. The same could be said here with respect to the children's physical needs, since the respondent has offered no way to provide for them physically while incarcerated. In effect, absent some unusual circumstances not present here, incarceration of a sole surviving parent, equals neglect based on impairment or imminent danger of impairment of children's physical and/or emotional needs.
Since it has been determined that the children are neglected, a dispositional hearing shall be scheduled pursuant to section 1045 of the Family Court Act.
NOW THEREFORE, for the reasons set forth above, it is
[*5]
ADJUDGED that facts sufficient to sustain the petition are established and the children Cheyanne, age 2 1/2 (DOB 1/24/01) and Nikolas, an infant (DOB 9/16/02) are neglected children (Family Court Act, § 1051[a]), to wit, Cheyanne's emotional condition was impaired and in imminent danger of becoming further impaired, and Nikolas's emotional condition was in imminent danger of becoming impaired, all as a result of the actions of their father, who failed to exercise a minimum degree of care with respect to them when he murdered their mother, and it is further
ADJUDGED that facts sufficient to sustain the petition are further established and the children Cheyanne, age 2 1/2 (DOB 1/24/01) and Nikolas, an infant (DOB 9/16/02) are neglected children (Family Court Act, § 1051[a]), because the respondent as an incarcerated and sole surviving parent under the circumstances here cannot provide for the physical needs, or the emotional needs, of his children; and it is further
ORDERED that the dispositional hearing in this matter shall be held before this Court on January 8, 2004 at 10 AM.
 DATED: November 26, 2003
Rochester, NY
HON. MARILYN L. O'CONNOR,
FAMILY COURT JUDGE
NOTICE: Pursuant to section 1113 of the Family Court Act, an appeal must be taken within thirty days of receipt of the order by appellant in court, thirty-five days from the mailing of the order to the appellant by the clerk of the court, or thirty days after service by a party or law guardian upon the appellant, whichever is earliest.
MAILED OR HAND-DELIVERED: Peter Essley, Esq., Brian A. Strait, Esq., Mitch Chait, Esq.

Decision Date: November 26, 2003